Argued April 10, affirmed September 24, 1952

# TOMASEK *v.* OREGON STATE HIGHWAY COMMISSION

248 P. 2d 703

121

122

123

*Ralph Wyckoff,* Assistant Attorney General, of Salem, argued the cause for appellant. With him on the brief were George Neuner, Attorney General, C. W. Enfield, Assistant Attorney General, and Fred A. Miller, Assistant Attorney General, all of Salem.

*Brazier C. Small,* of Salem, argued the cause and filed a brief for respondent.

Before BRAND, Chief Justice, and HAY, ROSSMAN, LUSK, and TOOZE, Justices.

TOOZE, J.

This is an action brought by Karel Tomasek, as plaintiff, against the state of Oregon, by and through Ben R. Chandler, Charles H. Reynolds, and M. K. McIver, constituting and acting as the Oregon State Highway Commission, as defendant, to recover the reasonable value of certain real property alleged to have been taken by defendant for public use. The action was tried to a jury, and a verdict in favor of plaintiff against defendant for the sum of $13,500 was returned. Judgment in favor of plaintiff was entered accordingly. Defendant appeals.

On April 25, 1950, plaintiff filed in the circuit court for Marion county his amended complaint setting forth his cause of action as follows (formal parts omitted):

## "I.

"That during all the times herein mentioned Ben R. Chandler, Charles H. Reynolds and M. K. McIver are, and with their predecessors in office, were the duly acting and qualified Highway Commission of the State of Oregon, and as such have and have had control over all matters pertaining to the selection, establishment, location, construction, improvement, maintenance, operation and administration of state highways and particularly that relocated segment of Highway 99-E and the bridge extending across the Santiam River northwest of Jefferson and southeast of Talbot, connecting Marion and Linn Counties.

## "II.

"That on or about July 10, 1945, and for a long time prior thereto, Plaintiff was and still is the owner of the following tract of land, to-wit:

"All of the West half of the Donation Land Claim of John M. Harrison and Nancy C. Harrison, his wife, same being Not. No. 481, Claim No. 56, being parts of Sections 28, 29, 32 and 33 in Township 9 South, Range 3 West of the Willamette Meridian, Oregon, said Donation Land Claim being described as follows:

"Beginning at a point 33.55 chains North and 4.47 chains West of the Northwest corner of said Section 33 and running thence East 80 chains; thence South 80 chains; thence West 80.07 chains; and thence North 80 chains to the place of beginning, containing 640.28 acres, said West half containing 320 acres, more or less, situated in Marion County, Oregon.

## "III.

"That said land was and is located a short distance down stream from said new highway bridge

crossing the Santiam River and on the easterly side and adjacent to the old river channel and was, before the erosion and damage hereinafter described, rich fertile river bottom land.

## "IV.

"That prior to the construction of the new highway grade and road bed for the new highway and highway bridge, Plaintiff's said land extended to the old channel of the river which is the boundary line between Marion and Linn Counties.

## "V.

"That on or about July 10, 1945, Defendant began the construction of a new highway bridge across the Santiam River and of a grade and road bed for said new highway which consisted of a rock and dirt fill raised to a considerable elevation above the natural contour of the land on both sides of the river bed. This road bed also formed the approaches to said bridge and extended for several hundred yards on either side of the bridge. This new construction was completed on or about October 1, 1947.

## "VI.

"That during all the times herein mentioned said highway bridge, said highway grade and road bed were constructed, owned and maintained by the Defendant and constituted a part of the state highway system of Oregon.

## "VII.

"That the Santiam River has been and will be subjected to periods of high water. Before the construction of said highway bridge, highway grade and road bed the increased flow of water during these high water periods spread out over a wide area along the river channel with an even flow and did not cause any material increase in the current or damage Plaintiff's said land by erosion or otherwise.

## "VIII.

"That Defendant constructed said highway grade and road bed which formed the approaches to said highway bridge for the purpose of protecting the said highway by keeping the traveled portion of the road above the high water level, and by doing so causes said water to be dammed and backed up, thus forcing a greatly increased flow of water under the bridge, thereby changing the direction and increasing the velocity of the current of the river during high water periods.

## "IX.

"That the aforesaid acts of Defendant were and are the proximate cause of the constricting of the channel of the river and of forcing a much greater volume of water under said bridge during high water periods than did flow in the river channel there before the construction of said highway grade, road bed and bridge, and of the changing of the direction of the current from its former course, and greatly increasing the velocity of the current of the river below said bridge during said high water periods, so that the entire flow of said river has been since said construction and now is being driven and forced into, against and over a large portion of Plaintiff's said land with such force and violence that the surface of the following described portion:

"Beginning at a point where the Northerly bank of the Santiam River intersects the West line of the John M. Harrison D.L.C. No. 56 in Township 9 South, Range 3 West of the Willamette Meridian, Marion County, Oregon; said beginning point being South 0° 09′ West, 4751.50 feet from the Northwest corner of said Harrison D.L.C.; Thence, South 0° 09′ West, 528.50 feet to the Southwest corner of said Harrison D.L.C.; Thence, South 89° 50′ 30″ East, along the South line of said D.L.C. 2632.75 feet to the Southeast corner of the West [East] ½ of said D.L.C.; Thence North 0° 25′ West, along the Division line of said D.L.C. 1236.00 feet to a point on the

North bank of the Santiam River; Thence, along the North bank of said River as follows:

"North 72° 24' West, 254.16 feet; North 78° 09' West, 100.00 feet; North 85° 52' West, 357.80 feet; South 70° 53' West, 295.00 feet; South 80° 20' West, 184.40 feet; South 77° 47' West, 124.90 feet; South 53° 20' West, 109.53 feet; South 61° 44' West, 231.58 feet; South 51° 18' West, 131.70 feet; South 59° 12' West, 419.10 feet; South 71° 57' West, 637.20 feet to the place of beginning, and containing 63.31 Acres, more or less.

"ALSO, a strip of land 100.00 feet in width, lying all along the North side of the North line of the above described tract, and containing 6.45 acres, more or less.

has been either completely washed away or rendered said land valueless to Plaintiff. That the Defendant by the acts herein alleged has created new channels for said river over and across Plaintiff's land, and the Defendant by its said acts herein alleged has appropriated for a public use the 64.00 acres of Plaintiff's land above described, that is of the reasonable value of $400.00 per acre, to Plaintiff's damage in the sum of $25,600.00.

"WHEREFORE, Plaintiff demands judgment against the Defendant for the sum of Twenty-five thousand six hundred (25,600.00) Dollars."

To this amended complaint defendant filed the following demurrer (omitting formal parts):

"Comes now the defendant and demurs to the amended complaint on file herein upon each of the following grounds:

"I.

"That the Court has no jurisdiction of the person of defendant.

"II.

"That the Court has no jurisdiction of the subject of the action.

"III.

"That the Complaint does not state facts sufficient to constitute a cause of action."

The trial court overruled the demurrer. This ruling by the trial court is the basis of defendant's first assignment of error on this appeal. In presenting its contention to the trial court, as well as in its brief in this court, defendant argued: (1) that the court lacked jurisdiction of the person of the defendant, on the ground that the state of Oregon is immune to suit except in those instances in which it has consented thereto; and (2) that the state of Oregon has not consented to the action at bar.

In overruling the demurrer the able trial judge accompanied the court's order with a memorandum opinion. We shall later have occasion to quote from that opinion.

To the amended complaint defendant filed the following answer (omitting formal parts):

"I.

"Answering paragraphs I and VI of plaintiff's amended complaint, defendant admits the allegations contained therein.

"II.

"Answering paragraph II of plaintiff's amended complaint, defendant denies each and every allegation contained therein, and the whole thereof.

"III.

"Answering paragraph III of plaintiff's amended complaint, defendant denies each and every allegation therein contained, and the whole thereof, except defendant admits that the real property described in paragraph III of said amended complaint is located in a westerly by north direction from the said bridge.

## "IV.

"Answering paragraph IV of Plaintiff's amended complaint, defendant denies each and every allegation therein contained, and the whole thereof.

## "V.

"Answering paragraph V of the plaintiff's amended complaint, defendant admits that on or about July 10, 1945, defendant began the construction of a new highway bridge across the Santiam River and of a grade and road bed for the said highway; further admits that said road bed formed the approaches to said bridge and extended for several hundred yards on either side of the bridge; and also further admits that the new construction was completed on or about October 1, 1947; but denies each and every other allegation in said paragraph contained, and the whole thereof.

## "VI.

"Answering paragraph VII of the plaintiff's amended complaint, defendant admits that the Santiam River has been subjected to periods of high water, and that during such periods of high water the waters of the Santiam River spread out over a wide area; but denies each and every other allegation in said paragraph contained, and the whole thereof.

## "VII.

"Answering paragraph VIII of plaintiff's amended complaint, defendant admits that defendant constructed said highway grade and road bed which formed the approaches to said highway bridge; but denies each and every other allegation in said paragraph contained, and the whole thereof.

## "VIII.

"Answering paragraph IX of plaintiff's amended complaint, defendant denies each and every allegation therein contained, and the whole thereof; and specifically denies that the reasonable

value of the land therein described ever was or now is $500.00 per acre or any other amount; and further specifically denies that plaintiff is now or has been damaged in the sum of $34,880.00, or in any other amount.

"For a further separate answer to plaintiff's amended complaint, defendant alleges:

## "I.

"The Santiam River is a mountain stream, which with its tributaries rise [sic] in the Cascade Mountains.

## "II.

"The Sanitam River after leaving the foothills of the Cascade Mountains flows across a great level area and empties into the Willamette River.

## "III.

"In the constant conduct of cutting and eroding, the Santiam River has continuously sought and established new channels, following each newly created channel only until it has succeeded in creating a new one by the forces of its devastating waters; and as a result of its constant establishment of new channels and abandonment of old channels, the bed of the said river is not constant and fixed, but is in a state of ever changing flux.

## "IV.

"The real property described in paragraphs II and IX of plaintiff's amended complaint constitutes a portion of the aforesaid great level area, which is crossed by the Santiam River.

## "V.

"If the lands described in paragraph IX of plaintiff's amended complaint have been flooded, inundated, washed away or rendered valueless, the sole and proximate cause thereof were [sic] forces of nature over which the defendant had no control, and without any act on the part of the defendant contributing thereto."

Plaintiff by his reply admits paragraphs I and II of defendant's further and separate answer, admits in paragraph III ''that the waters of the Santiam river run with great force and violence during high water periods and that the damming or interfering with the natural flow of the river during said periods constricts the flow of said river, increases its velocity and may change the direction of the current; and the acts of defendant, as alleged in the Amended Complaint, did change the channel of said river'', and denies all the remainder of the new matter contained in said answer.

Upon the conclusion of the trial and before the case was submitted to the jury, defendant moved the court for a directed verdict in its favor ''upon the ground and for the reason that the facts proved are not sufficient to entitle plaintiff, as a matter of law, to recover.'' In denying the motion, the trial court stated:

''This matter is before the court at the present time on defendant's motion for a directed verdict. I have given careful consideration to the record in this case and to the law cited in argument, as well as the independent research I have made on it, and there is a very serious question in my mind as to whether the evidence is sufficient to take this case to the jury, on the question of liability.

''However, I am going to submit this case to the jury at the request of the plaintiff, reserving in the defendant leave to renew the motion in the form of a motion for NOV in case there is an adverse verdict against defendant. In that event I will give further consideration to the motion.''

The trial was concluded and the verdict in favor of plaintiff returned on March 16, 1951. On March 19, 1951, defendant filed in said court and cause its motion

for judgment notwithstanding verdict, assigning as grounds therefor the following:

"1. That it appears from all of the evidence that this Court does not have jurisdiction of the subject matter of the action.

"2. That the evidence is insufficient to justify any verdict for the plaintiff.

"3. That the evidence is insufficient to justify submission to the jury.

"4. That the verdict is against law.

"5. That based upon the record of this case and Section 6-707, O.C.L.A., as amended by Chapter 149, O. L. 1945, the defendant is entitled to move for and have judgment in its favor made and entered, notwithstanding the verdict of the jury."

Under date of March 23, 1951, there was made and entered of record in said court and action a judgment based upon the verdict of the jury in favor of plaintiff and against defendant in the sum of $13,500, and costs. At that time no action had been taken by the court upon defendant's motion for judgment notwithstanding verdict. Under date of May 21, 1951, the trial court signed an order reciting that, on May 11, 1951, the matter came on regularly before the court upon defendant's motion for judgment notwithstanding verdict, and concluding "IT IS HEREBY ORDERED that such motion be and the same hereby is overruled." This order was not filed until 3:14 p.m. on May 22, 1951. On May 22, 1951, at 9:54 a.m. of said day, defendant filed in said court and action its notice of appeal dated May 21, 1951.

We invite attention to this record because, on this appeal defendant sets forth as its assignment of error VIII the following:

"Not having ruled upon defendant's motion for a directed verdict and for a judgment notwith-

standing the verdict, the Trial Court had no authority to enter a judgment for the plaintiff upon the verdict.''

In this connection, defendant contends that, having filed its notice of appeal in the morning of May 22, the trial court was ousted from further jurisdiction except such as might concern the settling and filing of the bill of exceptions, and that the court had no jurisdiction to enter the order which it did enter in the afternoon of May 22.

■■ We deem this assignment of error wholly without merit. The trial court denied the motion under date of May 21. That is the day it acted; not when the order was filed. As to the contention that the court did not rule upon defendant's motion for a directed verdict, it need only be said that the submission of the case to the jury was tantamount to overruling the motion, and, in any event, the order of May 21 would have that effect. It is observed that, in its ruling submitting the case to the jury and reserving to defendant leave to renew the motion in the form of a motion for judgment notwithstanding verdict in the event of an adverse verdict against defendant, the court did not state that such motion would be sustained. Its statement was: ''In that event I will give further consideration to the motion.'' The order of May 21 shows that the court did give further consideration to the matter and, upon such consideration, denied the motion.

As authority for its position under this assignment of error, defendant cites the following cases: *Wiedeman v. Campbell et al.,* 108 Or 55, 215 P 885; *Northern Pac. Ry. Co. v. Spencer,* 56 Or 250, 108 P 180; *Carroll v. Grande Ronde Elec. Co.,* 49 Or 477, 90 P 903. It is unnecessary to discuss those decisions,

because they are not in point upon the record in the instant case.

■ Section 6-707, OCLA, as amended by ch. 149, Oregon Laws 1945, in part provides:

"* * * In any case where, in the opinion of the court, a motion for a directed verdict ought to be granted, it may nevertheless, at the request of the adverse party, submit the case to the jury with leave to the moving party to move for judgment in his favor if the verdict is otherwise than as would have been directed.

"A motion in the alternative for a new trial may be joined with a motion for judgment notwithstanding the verdict and unless so joined shall, in the event that a motion for judgment notwithstanding the verdict is filed, be deemed waived. When both motions are filed, the motion for judgment notwithstanding the verdict shall have precedence over the motion for a new trial and if granted the court shall, nevertheless, rule on the motion for a new trial * * *."

Under this statute, even though the trial court is of the opinion at the close of the case that a motion for a directed verdict ought to be granted and submits the case to the jury with leave to the moving party to move for judgment in his favor if the verdict is otherwise than as would have been directed, it does not follow that the court must sustain the motion for judgment notwithstanding verdict. Upon such motion, the court may give the matter further consideration and may act in accordance with its then opinion.

Inasmuch as defendant assigns as error the failure of the trial court to sustain its motion for a directed verdict, as well as its motion for a judgment notwithstanding the verdict, it is necessary to discuss the evidence in the case in some detail. This discussion is also rendered essential because of the principal

contention in this case; viz., that the state is immune to this suit.

The evidence shows that the Santiam River is a mountain stream that rises in the Cascade mountains and, after leaving the foothills, flows in a general westerly direction across an extensive level area, finally emptying into the Willamette river. It is a turbulent stream, particularly in periods of high water. During the fall, winter, and spring months, and at more or less frequent intervals, it carried high flood waters. These waters spread out over a wide area on each side of its main channel. Because of the force of its waters, new channels are frequently cut, with an abandonment of old channels, and, therefore, its bed is not constant and fixed.

Between 1943 and 1945, the defendant, acting through its Highway Commission, relocated a segment of highway 99E (sometimes called the Pacific highway), running in a general northerly and southerly direction between the cities of Salem and Albany, and, as a part of such relocation, provided for the construction of a bridge across the Santiam river at a point northwest of Jefferson and southeast of Talbot, connecting Marion and Linn counties. The construction of this bridge at the point in question required a new grade and roadbed for said highway in its approaches to the bridge, extending for several hundred yards both immediately north and south of the bridge.

This new grade consisted of a rock and dirt fill that was raised to a substantial elevation above the natural contour of the land on both the north and south sides of the riverbed. Thousands of yards of gravel used in the construction of the grade and roadbed were taken from the bed of the river immediately east and

west and under the proposed location of the bridge, thus widening and deepening the channel of the river.

Construction of the bridge and its approaches was commenced in July, 1945, and was completed on or about October 1, 1947. In constructing the approach to the bridge proper from the north (as well as from the south), certain outlets were provided for the flow and escape of flood waters from the east to the west.

Prior to the road construction mentioned, flood waters of the Santiam river spread out over a wide area northerly and southerly of the river channel, and easterly and westerly of the place of such construction. The flow of these flood waters over said areas was even, and, by reason thereof, there was, during the time of such floods, no material increase in the velocity of the current of the main stream.

Prior to and on July 10, 1945, and at the time of trial, plaintiff was the owner of certain lands as described in paragraph II of the amended complaint. These lands are located in a general westerly direction from the highway bridge and, on their southwesterly side are bounded by the Santiam river. It is approximately one-half-mile downstream from the bridge to the nearest point on plaintiff's property. Defendant made some contention concerning the ownership of the property involved in this litigation; but that question was submitted to the jury, and there is substantial evidence in the record to support the verdict in that respect.

Prior to the construction of the highway grade and bridge, and in that vicinity, high waters ran across the extensive flood plain in a westerly direction. There were natural channels to handle this flow. The flow was unobstructed. This condition tended to neutralize the force of the current in the main river as it flowed

by and against plaintiff's property on the northerly bank of the river. As a result, natural erosion of the north bank was more or less slight and imperceptible.

Defendant in its construction of the grade, road-bed, and bridge closed approximately seventy per cent of the flood plain, blocking the natural channels and leaving only thirty per cent of the flood area open by outlets through and under the grade and bridge. The evidence discloses that, after construction was completed and during the periods of high waters, drift wood and other debris were caused to pile up against the easterly side and northerly end of the bridge structure, which, in effect, dammed up at least one of the outlets for the flow of flood waters. This debris was permitted to remain there.

This closing off of most of the flood plain, combined with the rock excavations from the bed of the river, had the effect of forcing larger volumes of water through the outlets and, more important, substantially increased the velocity and course of the current in the main river.

■ S. Sims, an experienced licensed engineer, formerly employed by the Oregon State Highway Department, made three surveys covering plaintiff's property; one in December, 1949; another in April, 1950; and the last in February, 1951. He, as a witness for plaintiff, testified that, between his first two surveys, erosion of plaintiff's land at the point where it was struck by the current of the river had progressed at the rate of 7/10 of an acre per month, and between his second and third surveys, at the rate of one-half an acre per month. This erosion naturally changed the course and channel of the main river from its original location to a place over and across the lands of plaintiff, and, of course, continued erosion will cause further

change of the course of the river and its encroachment upon the land of plaintiff. The evidence is almost conclusive that this erosion was and is not gradual and imperceptible, but, on the contrary, was and is abrupt, sudden, artificial, and proximately caused by the highway construction. Under such conditions, no boundaries are changed by reason of the change in the course of the river. 20 CJS, Counties, 766, § 15.

Sims also testified that the erosion on plaintiff's land extended back from the original bank of the river for a distance of approximately 400 feet, and that a total of 63 acres had been eroded. He also testified that this erosion was caused by the highway construction. On this, he was corroborated by other capable engineers. The land involved was deep, rich riverbottom land, adapted to the growing of mint, as well as other valuable crops, and there is testimony in the record that it had a reasonable market value of $350 to $400 per acre. The effect of the erosion was to wash away and remove all the surface soil of the land, leaving only a gravel bed and rendering it wholly worthless for farming purposes.

There is substantial evidence in the record to support every material allegation of plaintiff's amended complaint. Defendant offered the testimony of witnesses to the effect that the erosion of which plaintiff complains was due to natural causes over which it had no control, and not to any act on its part. However, by its verdict, the jury rejected this defense.

In instructing the jury, the trial court very carefully and correctly pointed out that before a verdict could be returned against defendant, it must appear from the evidence that whatever injury they might find plaintiff suffered was directly caused by the alleged acts of defendant.

As hereinbefore stated, defendant moved for a directed verdict "upon the ground and for the reason that the facts proved are not sufficient to entitle plaintiff, as a matter of law, to recover." In passing on this matter, the trial judge denied the motion, but stated that there was a question in his mind as to liability.

■ The motion for a directed verdict embraced two propositions: (1) whether there was substantial evidence sufficient to take the case to the jury; and (2) whether, in any event, as a matter of law, based on claimed immunity, defendant was liable for damages. On the first point, the record discloses conflicting evidence of a substantial character, thus making it a jury question. It is hornbook law that where there is any substantial evidence to sustain the allegations of the complaint, a jury question is presented. In such circumstances this court is bound by the verdict of the jury.

We now turn to the main point involved in this controversy; i.e., whether or not defendant, under the facts of this case, is immune to this action.

■ The Oregon State Highway Commission is a quasi-public corporation, an agency of the state. It was created by the legislative assembly to carry out purely state functions; that is, the location, relocation, construction, maintenance, and repair of state highways and bridges. Title 100, OCLA.

The Highway Commission is vested with broad powers. It is specifically empowered to:

"Acquire by purchase, agreement, donation, or by the exercise of the power of eminent domain, real property and/or any right or interest therein necessary or deemed necessary for rights of way, either for original location or for widening, straightening, or otherwise changing already established

highways. The commission may when acquiring real property for right of way acquire all right of access from abutting property to the highway to be constructed, relocated or widened on such right of way." § 100-115 (4), OCLA.

"Acquire by purchase, agreement, donation, or by the exercise of the power of eminent domain real property, or any right or interest therein, necessary or deemed necessary * * * for the appropriation, acquisition or manufacture of roadbuilding materials * * *." § 100-115 (5), OCLA.

Tort liability of the Highway Commission is limited to a maximum sum of $500. § 100-115 (15), OCLA. As to its contract liability, § 8-702, OCLA, as amended by ch 3, Oregon Laws 1941, in part provides:

"A suit or action may be maintained against * * * the state of Oregon by and through and in the name of its state highway commission upon a contract * * * made by such commission * * * and within the scope of its authority, and not otherwise * * *."

Section 100-114, OCLA, in part provides:

"The commission shall have full power to carry out the provisions of this act, and said commission hereby is given general supervision and control over all matters pertaining to the selection, establishment, location, construction, improvement, maintenance, operation and administration of state highways, the letting of contracts therefor, the selection of materials to be used therein, and all other matters and things necessary or proper or deemed necessary or proper for the accomplishment of the purposes of this act * * *."

Section 100-116, OCLA, provides, in general, that, whenever in the judgment of the Commission it is necessary to acquire real property for any of the purposes provided in the act, the Commission is authorized

to agree with the owner or owners of any interest in real property or lands required with respect to the compensation to be paid therefor and the damages, if any; and if no such agreement is reached, then condemnation proceedings are authorized, the statute providing in detail how such proceedings should be conducted.

Article 1, § 18, Constitution of Oregon, provides:

"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in the case of the state, without such compensation first assessed and tendered; provided, that the use of all roads, ways and waterways necessary to promote the transportation of the raw products of mine or farm or forest or water for beneficial use or drainage is necessary to the development and welfare of the state and is declared a public use."

The power of eminent domain is inherent in the sovereign state and is founded upon the law of necessity. It does not depend for its existence upon a specific grant in the constitution of the state. However, this power may be limited by constitutional provision, and art. 1, § 18, Oregon Const., provides such a limitation. This limitation is in favor of the individual owner of property. It is a specific constitutional right and protection that cannot be taken away or destroyed by legislative act or legislative failure to act. It is a restriction placed by the constitution upon the state itself, and upon all of it agencies that derive from it their power of eminent domain, including the State Highway Commission.

Though the power of eminent domain is inherent in the state, it lies dormant until called into existence by express legislative authority, but this legislative authority is always subject to constitutional limita-

tions. *State ex rel. v. Hawk et al.,* 105 Or 319, 208 P 709, 209 P 607.

 The constitutional right and protection given the owner of property by art. 1, § 18, Oregon Const., supra, is unquestionably self-executing. It is an absolute right, and, for its violation, the injured person may have his remedy in a common-law action in the absence of statutory provision therefor. This remedy should not be, nor is it, dependent upon legislative action. It is manifest that the legislature has no power to abrogate or deny a constitutional right, nor may a right that is constitutionally granted be taken away or rendered nugatory by failure of the legislature to act. Without doubt, a constitutional right may be, and frequently is, subjected to reasonable rules and regulations for the enforcement and protection thereof; but any such rules and regulations must not only be reasonable, but also must be for the enforcement and protection of the right, and not in denial thereof. *Levene et ux. v. City of Salem,* 191 Or 182, 229 P2d 255; *Morrison v. Clackamas County,* 141 Or 564, 18 P2d 814; *State v. Fletcher,* 168 Okla 538, 34 P2d 595; *Commonwealth v. Plymouth Coal Co.,* 232 Pa 141, 81 Atl 148 (232 US 531, 34 S Ct 359, 58 L ed 713); *Chick Springs Water Co. v. State Highway Department,* 159 SC 481, 157 SE 842; 18 Am Jur, Eminent Domain, 635, § 7.

It is stated in 18 Am Jur, Eminent Domain, 635, § 7, as follows:

"The power of eminent domain does not depend for its existence on a specific grant in the Constitution. It is inherent in sovereignty * * *. It is founded on the law of necessity. The provisions found in most of the state Constitutions relating to the taking of property for the public use do not by implication grant the power to the govern-

ment of the state, *but limit a power which would otherwise be without limit."* (Italics ours.)

In *Chick Springs Water Co. v. State Highway Department,* supra, at page 501, the South Carolina Court said:

"No valid distinction can be drawn between cities, counties, and other political subdivisions * * * and the state highway department * * *. All are agencies of the State, and all derive their immunity from the same source, the State, and upon the ground that, being agencies of the State, they are in effect the State itself. Counties, cities, and other political subdivisions are held liable where they take property, not upon the ground that they are authorized by statute to be sued, but because of the constitutional provision requiring compensation to be made for such taking. This protection is afforded to the humblest citizen by the Constitutions of the State and the United States, and neither government can itself or by any statute or through any agency take property without paying compensation. 'Immunity from suit' cannot avail in this instance, and, if no statute exists, liability still exists, because as to this provision the Constitutions are self-executing.

"To hold otherwise would be to say that the Constitution itself gives a right which the Legislature may deny by failing or refusing to provide a remedy. Such a construction would indeed make the constitutional provision a hollow mockery instead of a safeguard for the rights of citizens.

"No court has ever applied the doctrine of immunity from suit to cases like the one at bar, nor can they, for to do so would absolutely annul the provision of Article 1, Section 17, of the Constitution."

The facts in this South Carolina case were quite similar to those existent in the instant case, and the contentions urged there by the defendant State High-

way Department were substantially the same as those made by defendant in this proceeding.

In the case of *Great Northern Ry. Co. v. State,* 102 Wash 348, 173 P 40, 42, LRA 1918E, 987, the state was sued by the railroad company for injury to its property, resulting from the construction of a state highway. The highway was built upon a hillside, approximately parallel with, and from 125 to 175 feet above, plaintiff's railroad track. Because of the steepness of the bluff, it was necessary to blast out a shelf for the highway and to dump material on the hillside and railroad track below. This caused slides, obstructed the track, bent rails, damaged ties, poles, and wires, and delayed trains, for which the plaintiff claimed an expenditure of $16,715.53 and an estimated sum of $25,000 to protect against imminent danger of further damage from slides caused by deposits and impaired drainage. The state's demurrer to the complaint and its motion for judgment non obstante veredicto were overruled. A verdict was returned in favor of plaintiff for $7,391.34. Plaintiff appealed, and defendant cross-appealed. In ruling upon the contention of the state that it was not liable for the damages sustained by plaintiff, the Supreme Court of Washington said, at page 352:

"It is contended by the state that a suit against it to recover for damages will not lie, and that the damage herein involved is not for a public use within the meaning of the constitutional provision requiring compensation. We cannot accede to this contention; for, if the state could have condemned the right to inflict the necessary damage or invade plaintiff's property, *its failure to so condemn is not an excuse to deny plaintiff's recovery.* Kincaid v. Seattle, supra [74 Wash 617, 134 P 820]; Provident Trust Co. v. Spokane, 75 Wash. 217, 134 Pac. 927, Ann. Cas. 1915C 63. (Italics ours.)

"When taking private property for a public use, the state acts in its sovereign capacity. Gasaway v. Seattle, 52 Wash. 444, 100 Pac. 991, 21 L.R.A. (N.S.) 68. It goes not as a trespasser, inspired by selfish or unlawful motive, but as one taking without malice or intent to do wrong, and presumptively for the public good. It cannot put on the cloak of a tort-feasor under the statute if it would. It cannot plead a wilful wrong to defeat a just claim. The action for damages for land taken without compensation is usually spoken of and is in its nature one of trespass; but it is not strictly so. If the state or its agent, in the prosecution of a public work, takes no more than is necessary and prosecutes its work without negligence, it is neither a trespasser nor a tort-feasor. Kincaid v. Seattle, supra. * * *

"* * * * *

"In our opinion, the theory that property rights are ever to be sacrificed to public convenience or necessity without just compensation is fraught with danger, and should find no lodgment in American jurisprudence. If the acts which caused the injury were done under, and in consequence of, the direction of the state, then the state is to be regarded as the superior and responsible as such, although it does the work by contract and by the direction of its duly authorized officers. The plaintiff's complaint states a cause of action under art. 1, § 16, of our constitution, and the state's demurrer was properly overruled."

■ In support of his right to maintain this action, plaintiff invites our attention to art. 1, § 10, Oregon Const., which in part provides:

"* * * and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

This constitutional provision is not applicable to the case now before the court.

The constitution having created the absolute right in the owner of property as against the state, such provision carried with it a waiver of immunity on the part of the state to actions prosecuted for damages for its violation.

█ It also is to be noted that under art. 1, § 18, the state is fully authorized to take private property for a public use without compensation therefor being first assessed and tendered. In other words, the assessment and tender of just compensation is not a condition precedent to a taking. The taking may occur and the amount of compensation be determined and paid later. Hence, it is not necessary for the state to proceed first by condemnation proceedings in order to perfect its right to take. If there is a taking by the state without compensation being first assessed and tendered, it manifestly would be absurd to attribute to the framers of the constitution an intention that the state might destroy the right and protection given the owner of property and evade the payment of just compensation, simply through the medium of failing or refusing to institute condemnation proceedings.

█ To support an action for compensation or damages such as we have here, three things must concur and combine; viz., (1) there must be a taking of private property for a public use by (2) a state agency authorized to exercise the power of eminent domain, and (3) it must be property that is subject to be taken for a public use. Insofar as the problem now before the court is concerned, and as is so well pointed out in *Chick Springs Water Co. v. State Highway Department, supra,* it is immaterial whether the taking is directly by the state itself, or by one of its lawfully constituted agencies, such as a county, a school district, the State Fish and Game Commission, or the State Highway Department.

In its brief defendant argues that, in bringing this action, plaintiff did not conform to established legal procedure, and that, if he had any remedy at all, he should have proceeded in mandamus to compel the State Highway Commission to prosecute condemnation proceedings as provided by statute. Defendant states as follows:

> "Rather than following any well-established path, the plaintiff elected to proceed upon the untried path of suing the State of Oregon directly. * * * Although no authority or precedent for such a cause of action exists, the plaintiff elected to proceed directly against the State of Oregon."

This contention is obviously based upon an erroneous premise; that is, that a distinction is to be drawn between the state itself and its agencies. As we have observed, no such distinction can be made under the situation presented in this case. In bringing the instant action, plaintiff did follow a well-established path. *Morrison v. Clackamas County*, 141 Or 564, 18 P2d 814.

In *Morrison v. Clackamas County*, supra, plaintiff brought action against the county to recover damages to his property caused by the acts of defendant upon the theory that the county had taken his property for a public use within the purview of the constitution. In its essential facts, that case is almost identical to the one at bar. There, according to the complaint, plaintiff's lands were eroded, the surface thereof being washed away and the land rendered valueless, by reason of a change in the current of the Sandy river because of certain acts of defendant in constructing a jetty in the stream for the purpose of protecting a bridge across the river. A demurrer to the complaint was sustained, and plaintiff appealed. In reversing the

case, this court, speaking through the late Justice HENRY J. BEAN, at page 567, said:

"The facts alleged in the complaint show that the property of plaintiff was, by reason of the construction of the jetty by the county, subjected to the destruction alleged for a public use, namely, to protect the county highway and the county bridge, without just compensation. We think the use or destruction of the property amounted to a taking for public use within the meaning of article 1, section 18 of the constitution of Oregon. The action of the county constituted a taking within the meaning of the constitution just as much as if the county had taken the dirt or soil which was washed away from plaintiff's land and used it for widening the highway which was intended to be benefited by the construction of the jetty. *The county is bound by the natural consequence of its acts, whether the result was contemplated or not.*" (Italics ours.)

Commencing at page 568, the court further stated:

"According to the more modern authorities, any destruction, restriction or interruption of the common and necessary use and enjoyment of the property of a person for a public purpose constitutes a 'taking' thereof. [Citing cases.]

"When the current or flow of a stream of water is obstructed or diverted from its natural course for a public use, so that it invades and totally destroys private property or materially decreases its value, it amounts to a taking within the meaning of the state and federal constitutions. Theiler v. Tillamook County, 75 Or. 214 (146 P. 828); Pumpelly v. Green Bay Co., 13 Wall. 166 (20 L. Ed. 557); United States v. Lynah, 188 U.S. 445 (23 S. Ct. 349, 47 L. Ed. 539); White v. Pennsylvania R. Co., 229 Pa. 480 (78 Atl. 1035, 38 L.R.A. (N.S.) 1040); Conger v. Pierce County, 116 Wash. 27 (198 P. 377, 18 A.L.R. 393); 1 Lewis on Eminent Domain, (3d Ed.) 86, § 78.

> "It is not necessary that the owner of the property be actually dispossessed or that the property be completely destroyed in order to constitute a taking within the meaning of the constitutional provisions. [Citing cases.]
>
> "In an action of this character it is no defense that there was no specific intention on the part of defendant to appropriate plaintiff's property, but the defendant must be held to have intended to do those things which are the natural and ordinary consequences of his act. Doubtless the defendant county intended to construct the jetty. The natural consequence, of course, followed. * * *
>
> "*The provisions of the constitutions to the effect that private property shall not be taken for public use without just compensation are self-executing* and the injured individual has a remedy at law to recover the damages sustained apart from eminent domain proceedings." (Italics ours.)

Also see *Levene et ux. v. City of Salem,* 191 Or 182, 229 P2d 255; *Theiler v. Tillamook County,* supra.

In *Levene et ux. v. City of Salem,* supra, Mr. Justice HAY, in writing the opinion of the court, at page 196, said:

> "Where the acts of the municipality result in a direct and continuous trespass upon real property, as by diverting the flow of a stream from its natural course onto the property, or by flooding the property through a drain or sewer so constructed that such flooding is a necessary result of the construction, this constitutes a 'taking' within the meaning of a constitutional provision requiring compensation to be made for property taken for a public use. And this is so even if the owner of the property is not actually dispossessed or the property completely destroyed by the taking. Morrison v. Clackamas County, 141 Or. 564, 569, 18 P.2d 814; Stephens v. City of Eugene, supra, 90 Or. 167, 173, 175 P. 855; Annotations: 75 A.L.R. 1198, 173 A.L.R. 1045, 128 A.L.R. 1195, 1197. *In such*

*cases, neither the state nor any municipal corpora-
tion may claim exemption from liability."* (Italics
ours.)

In the instant case, defendant was fully empowered
to relocate a segment of highway 99E and, in that
connection, construct a new bridge across the Santiam
river, with necessary approaches. The method of con-
structing the new grade, roadbed, and bridge was ex-
clusively within its jurisdiction to determine. It is pre-
sumed that, in adopting the plans and specifications
for this construction, defendant acted properly and in
accordance with the necessities of the occasion as de-
termined by it.

At the scene of this construction the Santiam
river is a navigable stream, and ownership of its bed
lies in the state. It follows, therefore, that defendant
acted within its rights (rights incident to ownership)
when it excavated gravel from this riverbed for use in
constructing its grade and roadbed. All of the acts per-
formed as incidents to the work in question were
lawful. All of them were for a public purpose. But
the direct effect of this construction was a partial
destruction of plaintiff's lands, it constituted a taking
for a public purpose within the meaning of the consti-
tution. It is the fact of taking, rather than the manner
of taking, that is important. For this taking of his
land, plaintiff is entitled to compensation.

Defendant contends that the judgment is im-
proper because "there is no provision for any appro-
priation or conveyance to the State. The form of judg-
ment may be proper for a tort claim but it is not in an
inverse condemnation action. The omission of any pro-
vision for appropriation is extremely important and is
also rather significant. * * * If the State of Oregon
should pay the plaintiff $13,500.00, it is entitled to

something in return; and this the judgment makes no provision for.''

In answer to this contention, it is sufficient to say that in a proceeding upon facts such as we have before us, it is not necessary that there be a conveyance to the state, nor that the judgment provide for appropriation by the state. It is true that the state is entitled to something in return for the payment it makes; but under the facts of this case, the state already has had that something. It has enjoyed the benefit of this taking of plaintiff's property by the construction of its highway in the manner it desired and deemed necessary. The contention of defendant is also fully answered by the decision of this court in *Levene et ux. v. City of Salem,* supra.

■ As authority for its position that the state is immune to this suit, no statute having been adopted by the legislature directly authorizing it, defendant invites our attention to art. IV, § 24, Const. of Oregon, which provides:

"Provision may be made by general law for bringing suit against the state, as to all liabilities originating after or existing at the time of the adoption of this constitution; but no special act authorizing such suit to be brought or making compensation to any person claiming damages against the state, shall ever be passed."

From what we have already said, it is clear that this constitutional provision has no application to the case now before us. This provision is simply a constitutional declaration of a well-recognized rule that the state can be sued in its own courts only with its consent. No one quarrels with that principle. But as we have before observed, the right guaranteed by art. 1, § 18, carries with it, of necessity, the consent of the state to be sued for its violation.

Defendant invites our attention to the case of *Federal Land Bank v. Schermerhorn,* 155 Or 533, 64 P2d 1337. That was a suit to foreclose a mortgage. The state was made a party defendant because it had a lien upon the property which plaintiff sought to have established as inferior to its own lien. The attorney general filed a motion to quash service of summons and complaint on the state on the ground that it was immune to such suit, which motion was denied. The mortgage was foreclosed, and the decree adjudged that the lien of the state was inferior to the lien of plaintiff's mortgage. The state appealed. The issue was stated in this court as follows at page 534:

> "The sole issue presented by this appeal is whether the State of Oregon can be made a party defendant in suits praying (1) for the foreclosure of mortgages, and (2) that the state's right in the property, whatever it may be, be declared inferior to the rights of the mortgagee plaintiff."

No statute having been adopted authorizing such a suit against the state, this court held that it was immune thereto. After quoting art. 1, § 10, and art. 1, § 18, of the constitution, Mr. Justice ROSSMAN, in writing the opinion of the court, said (p. 549):

> "It [plaintiff] argues that, since these provisions are self-executing, authority is here expressed for the maintenance of this suit. These two provisions, together with Article IV, § 24, Oregon Constitution, which provides that suit cannot be instituted against the state without its consent, are parts of our original Constitution. This is persuasive proof that they are not in conflict with one another. Under similar constitutional provisions it has been held that the state need not provide any means by which a suit can be brought against itself: Carolina Glass Co. v. South Carolina, 240 U.S. 305 (60 L. Ed. 658, 36 S. Ct. 293). See to same effect Platt

v. Newberg, 104 Or. 148 (205 P. 296). In our opinion, this contention is without merit.''

The case of *Platt v. Newberg* cited by the court involved an action for damages against the city of Newberg for injuries sustained from a defective sidewalk. It was purely a tort action. The contention that the city was immune to tort liability was sustained. This court has consistently held to that principle in the absence of waiver of immunity by statutory or charter provision. But we are not here concerned with tort liability in the sense that that question has been considered in many prior decisions. In the Federal Land Bank case the only question at issue was as stated by the court and quoted supra. What we said there was not intended to, nor did it, imply that no remedy existed in the absence of statutory provision where there had been a taking of property for a public purpose within the meaning of art. 1, § 18. It is significant that, in the Federal Land Bank case, we neither cited nor in any way commented upon the decision in *Morrison v. Clackamas County*, supra. This is a recognition of the fact that the situations were entirely different.

■ After quoting from the Federal Land Bank case the portion above set forth, the trial judge, in his memorandum opinion respecting defendant's demurrer, spoke as follows:

"Although the writer experiences some difficulty in reading the unambiguous language of Article IV, Section 24, as absolutely prohibitory, there is no particular difficulty in harmonizing the three constitutional provisions referred to. The wording of Article IV, Section 24, indicates to this writer that said section was intended to authorize the legislature by general law to specify suits or actions, other than those already authorized, which might be brought against the state and to provide

a procedure therefor, rather than to annul a right already granted. So read, that section is not in conflict with any other provision of the Constitution nor with the common law rule that private property cannot be taken for public use without just compensation."

We believe this interpretation to be correct.

Upon the claim that the state is immune to this suit, defendant also cites as authorities a large number of cases, in addition to those heretofore mentioned: *Lucas v. Banfield et al.,* 180 Or 437, 177 P2d 244; *State ex rel. v. Franklin,* 163 Or 500, 98 P2d 724; *Noonan v. City of Portland,* 161 Or 213, 88 P2d 808; *United Contracting Co. v. Duby,* 134 Or 1, 292 P 309; *Mohler et ux. v. Fish Commission,* 129 Or 302, 276 P 691; *Kurtz v. Southern Pacific Co.,* 80 Or 213, 155 P 367, 156 P 794; *Keene v. Smith,* 44 Or 525, 75 P 1065; *Salem Mills Co. v. Lord,* 42 Or 82, 69 P 1033, 70 P 832; *Mosier v. Oregon Navigation Co.,* 39 Or. 256, 64 P 453, 21 Am & Eng R R Cas 508; *Kawananakoa v. Polyblank,* 205 US 349, 27 S Ct 526, 51 L ed 834.

For us to discuss these several decisions would unnecessarily prolong this opinion. Suffice it to say that each of them is readily distinguishable from the case at bar; in other words, those several holdings are not applicable to the facts present in the instant case.

We note the further contention of defendant that the verdict of the jury was necessarily based upon mere surmise, speculation, conjecture, or suspicion and for that reason cannot stand. It is a well-established rule in this state that no recovery can be had where resort must be had to speculation or conjecture for the purpose of determining whether the damages resulted from the act of which complaint is made or from

some other cause. *Becker v. Tillamook Bay Lumber Co.*, 194 Or 134, 240 P2d 237, 241; *Allen et ux. v. McCormick*, 193 Or 604, 612, 238 P2d 220; *Spain v. Oregon Washington R. & N. Co.*, 78 Or 355, 369, 153 P 470, 475, Ann Cas 1917E, 1104. However, there is substantial evidence in this case to the effect that the acts of defendant were the direct cause of the damages sustained by plaintiff. It was the exclusive province of the jury to weigh that evidence, and, by its verdict in favor of plaintiff, it decided the issue against defendant. There is no merit in this contention.

Other errors are assigned by defendant, including exceptions taken to the refusal of the trial court to give the jury certain requested instructions. We have carefully considered all the errors alleged, and, in particular, we have given attention to the requested instructions in the light of the issues and the instructions the court did give the jury. Some of the requested instructions were merely statements of abstract propositions of law, correct so far as they went, but wholly immaterial to a decision upon the facts in this case. Those that were material were fully covered by the court's own instructions. The jury was fully and correctly instructed upon all the material issues. We find no prejudicial error in the record.

The judgment is affirmed.